William E. Lamble and Florence G. Lamble v. Commissioner.
Lamble v. Commissioner
Docket No. 827-66.
United States Tax Court
T.C. Memo 1967-185; 1967 Tax Ct. Memo LEXIS 76; 26 T.C.M. (CCH) 912; T.C.M. (RIA) 67185; September 22, 1967
Jacques T. Schlenger, 1400 Mercantile Trust Bldg., Baltimore, Md., and Theodore W. Hirsh, for the petitioners. Charles F. T. Carroll, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax of petitioners in the amount of $3,351.26 for the year 1962. The sole issue is whether the sale by William E. Lamble in 1962 of a business individually owned by him to a corporation in which he owned all of the common (but none of the preferred) stock resulted in the receipt by him of a dividend distribution from that corporation. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Petitioners, husband and wife, are residents of Brooklandville, Maryland, and resided there *77 at the time of the filing of the petition herein. They filed their joint Federal income tax return for the taxable year 1962 with the district director of internal revenue at Baltimore, Maryland. Petitioner William E. Lamble will be referred to hereinafter as "petitioner." Southern Packing Company, Incorporated, (hereinafter sometimes referred to as "Southern Packing"), incorporated under the laws of the State of Maryland on April 25, 1913, was organized by petitioner's father, William E. Lamble, Sr. (hereinafter sometimes referred to as "Lamble, Sr."). It is engaged in the business of packing, freezing and distributing frozen fruits, such as strawberries, peaches, raspberries, pineapples, bananas, and various citrus fruits. It also cans and sells applesauce, apple butter, and fruit purees. Its customers are mainly institutional purchasers and restaurants. There were outstanding 1,000 shares of stock in Southern Packing, all common. At the time of Lamble, Sr.'s death, on July 5, 1958, he owned 520 shares. At some undisclosed time or times, he had previously given the remaining 480 shares to his children, petitioner William E. Lamble and his three sisters, and on July 5, 1958, those *78 480 shares were held by petitioner and his sisters as follows: Petitioner
210 shares
Marguerite L. Burke
100 shares
Charlotte L. Cooper
100 shares
Eugenia L. Brick
70 shares
480 shares
Petitioner had been active together with his father in the conduct of the business of Southern Packing. Lamble, Sr.'s will provided for a complete recapitalization of the corporation, whereby petitioner would become the sole owner of the common stock and his three sisters the sole owners of a new issue of preferred stock. Pursuant to this provision, articles of amendment were filed by Southern Packing on August 14, 1958, which amended its charter to authorize 3,500 shares of $100 par value cumulative preferred stock and 1,000 shares of $100 par value common stock. The articles of amendment provided that the holders of the preferred stock were entitled to receive from the surplus or net profits of the corporation, when and as declared by the board of directors, a dividend of $6 per share per annum, payable semi-annually on the first day of January and July of each year; that such dividends were cumulative and were to be paid before any dividends were paid or set apart on *79 the common stock; and that in the event of liquidation the preferred stockholders were to be paid $115 per share plus all accumulated and unpaid dividends on such preferred stock before anything was paid to the holders of the common stock. While in general only the common stock had voting power, in the event that four consecutive semi-annual dividends were in arrears, the preferred stockholders would become entitled to one vote per share. The preferred stock was also made redeemable, on any of the dates fixed for the payment of dividends, at $115 per share plus all unpaid dividends. On September 9, 1958, all of the stockholders of Southern Packing except petitioner exchanged all their common stock for the new preferred stock of Packing as follows: Old
New
Common
Preferred
Shares
Shares
Surrendered
Received
Executor of the Estate of
William E. Lamble, Sr.
520
2,210
Marguerite L. Burke
100
425
Charlotte L. Cooper
100
425
Eugenia L. Brick
70
297 1/2
3,357 1/2
Petitioner then emerged as the sole owner of the common stock of Southern Packing. Approximately one-third of the preferred stock was owned outright by petitioner's three sisters. *80 The other two-thirds was held by the estate of Lamble, Sr., in trust for the families of the sisters. [1] Petitioner was one of three trustees of his father's estate. The terms of the will of Lamble, Sr., also provided that petitioner was to receive all of his father's capital stock in a corporation known as Maryland Beverage Company, Incorporated (hereinafter sometimes referred to as "Maryland Beverage"), a Maryland corporation organized by Lamble, Sr., on August 10, 1938, to process and sell a canned sterilized chocolate drink. Lamble, Sr., had previously participated in an unsuccessful effort to bottle a chocolate drink and, not wanting to involve Southern Packing in a similar venture which might also fail, he set up Maryland Beverage to exploit a new, recently acquired formula for making a chocolate drink. It appears, however, that this formula was of little use, and that it *81 took Maryland Beverage an extensive period of time before it finally developed a marketable canned chocolate drink. The difficulty encountered in developing a canned sterilized chocolate drink lay in the fact that the beverage would curdle and turn sour after a short period of time. Petitioner, working for Maryland Beverage, brought in consultants of food technology from the canning industry and eventually discovered or developed a process which overcame this obstacle, giving the canned sterilized chocolate drink an average shelf life of 18 months. By contrast, a bottled pasteurized chocolate drink would keep only under refrigeration, and would spoil in three or four days. Although Maryland Beverage was established as a separate corporation to carry on the chocolate drink venture, and in fact developed and owned the process for producing a sterilized chocolate drink, the actual processing and canning of the drink, as well as warehousing after manufacture, was done by Southern Packing in its facilities. The machinery for preparing and sterilizing the drink, acquired by Southern Packing between 1938 and 1940, was entirely separate from that used in Southern Packing's business, since *82 none of its products required sterilization by heat as did the chocolate drink. The machinery was standard equipment in the canning industry. The amount of space devoted to the manufacture and warehousing of the chocolate drink was less than ten percent of the total square footage in Southern Packing's plant. Under the arrangement between Southern Packing and Maryland Beverage, Southern Packing was reimbursed for all direct labor charges incurred in producing and handling the chocolate drink. Southern Packing also purchased all of the cans needed by Maryland Beverage, for which it was also directly reimbursed. In addition, Maryland Beverage paid Southern Packing approximately 6 cents for every dozen cans of chocolate drink produced to cover manufacturing overhead, such as the cost of steam, supervisory personnel, depreciation of equipment, use of the plant space, and other indirect costs, plus a ten percent profit to Southern Packing. This was approximately the same as other canning companies would charge for the same services. Because of the seasonal nature of Southern Packing's business, it found itself at various times with no inventories of fresh fruits for processing. In contract, *83 the chocolate drink which it canned for Maryland Beverage could be produced at any time, and it was during just such slack periods in its own operations that it processed the chocolate drink. The use of its supervisory personnel and facilities at such times enabled Southern Packing to recoup a substantial amount of indirect costs or charges that it would have been required to incur in any event. Thus, wholly apart from the ten percent profit reflected in the fees received by Southern Packing for its services, the reimbursement of indirect or overhead charges was itself profitable to Southern Packing in these circumstances. The following schedule shows fees charged by Southern Packing to Maryland Beverage which reflected overhead charges and Southern Packing's profits: Year Ended
Fees Charged
1951
$21,797.16
1952
19,689.36
1953
17,421.47
1954
11,872.64
1955
9,364.25
1956
9,511.55
1957
10,024.54
1958
5,502.50
1959
6,452.82
1960
7,418.25
8/1/60 to 12/31/60
3,273.82
1/1/61 to 12/31/61
8,925.11
At Lamble, Sr.'s death in 1958, there were 55 shares of Maryland Beverage stock outstanding, recorded on Maryland Beverage's books at $100 per share. *84 Thirty shares were held by Lamble, Sr., twenty shares were held by petitioner, and five shares were held by Miss L. W. Limpert, the office manager and bookkeeper of Southern Packing and Maryland Beverage for approximately 30 years. The 30 shares of Maryland Beverage received by petitioner under the terms of his father's will were listed on the Federal estate tax return as having a value of $798.53 per share, or a total value of $23,955.90 as of the date of death on July 5, 1958. The estate tax return indicates that this value was determined solely by reference to the book value of the shares. On July 29, 1960, Maryland Beverage was liquidated and dissolved under the provisions of section 331, Internal Revenue Code of 1954. The net book value of its stock on this date was $818.13 per share. In computing book value, no amount was recognized as good will on the books of the company, and the only intangible asset recognized was one entitled "Trademark," which was carried on its books at a value of $90.75. Miss L. W. Limpert received a liquidating distribution equal to the book value of her five shares, a total of $4,090.64, in cash. Miss Limpert was approximately *85 55 years old at this time, a victim of cancer, and had no desire to retain any interest in the business. She died in 1962 or 1963. Petitioner reported the receipt of the remaining assets of Maryland Beverage on his 1960 Federal income tax return at their book value, which amounted to $40,906.44, and reported the excess of this $40,906.44 over his adjusted basis in the stock as capital gain. From July 30, 1960, until July 2, 1962, the Maryland Beverage Company (hereinafter sometimes referred to as the Beverage proprietorship) was operated by petitioner as a sole proprietorship. The existing arrangement whereby Southern Packing would process, can and warehouse the sterilized chocolate drink and Maryland Beverage would pay for the cost of cans, all direct labor costs, plus an additional 6 cents per dozen cans for overhead and profit, was continued unchanged. During the summer of 1961, as a result in part at least of the omission of the Southern Packing preferred stock dividend due July 1, 1961, petitioner's sisters raised a question of a possible conflict of interest arising from petitioner's ownership of both the Beverage proprietorship and all the common stock of Southern Packing. *86 The sisters were uncertain as to whether Southern Packing was being adequately reimbursed for its costs with respect to the operations performed for the proprietorship. Petitioner denied any conflict of interest, but, nevertheless, stated that he would consider a sale of the proprietorship to the corporation. Although various meetings were held between the parties, at which the omission of the preferred stock dividend and petitioner's management of Southern Packing in general were also discussed, the matter was not resolved. Finally, the sisters retained a firm of attorneys to represent them in the dispute and petitioner retained his own counsel. The dispute itself also involved the broader question of the administration of the testamentary trust, of which petitioner was a trustee. Despite all this, however, petitioner and his sisters remained in a reasonably good relationship, and managed to keep their differences of opinion on a friendly plane. The subject of the sale of the Beverage proprietorship to Southern Packing was brought up in a letter to petitioner from the attorneys retained by his sisters, dated September 15, 1961, in which petitioner was asked: "What benefits, if any, *87 would accrue to * * * [Southern Packing] from the proposed acquisition of Maryland Beverage Company, and what would justify any substantial payment therefor?" Petitioner, in his reply dated October 9, 1961, stated that: "Any benefit which would inure to * * * [Southern Packing] from such an acquisition would depend, of course, upon the earnings of Maryland Beverage Company and the value of the assets which would be so acquired. Such an acquisition would, of course, involve Mr. Lamble [petitioner] in a dual position and could not be consummated except in a manner which would completely protect Mr. Lamble in the circumstances * * *." At a meeting of the board of directors of Southern Packing held on December 21, 1961, petitioner submitted a memorandum in which he pointed out that the beverage enterprise had made substantial contributions toward the overhead of Southern Packing and submitted a schedule showing the amounts of those contributions and the sales and profits of Maryland Beverage and the successor proprietorship over the preceding 11 1/2 years. The memorandum concluded that: "W. E. Lamble feels a fair price, based on the foregoing, is $25,000 over all Maryland Beverage *88 Company assets at cost, which amount to approximately $8,000, as of December 13, 1961." After discussion, it was decided that action on the proposed acquisition be postponed until a further meeting. All the directors of Southern Packing were elected by the vote of petitioner, the sole common stockholder. However, petitioner considered Mr. John D. Wright, a director of Southern Packing as well as a trustee of the estate of Lamble, Sr., as a representative of the preferred stockholders on the board. The minutes of the meeting of December 21, 1961 reflect that the majority of the directors voted to omit the preferred stock dividend due December 31, 1961, but that Mr. John D. Wright did not concur in this decision. The reason for the passing of dividends on the preferred stock due on July 1, 1961 and December 31, 1961 was the fact that the corporation sustained a loss in that year. The preferred stockholders felt that an acceptable value for the good will of the Beverage proprietorship would be in the range of $7,500 to $12,000, and felt that petitioner's offer of $25,000 was too high. After discussions between petitioner and the preferred stockholders, in which no sales price could *89 be agreed upon, it was finally agreed that an outside party should value the business. On May 9, 1962, at a special meeting of the board of directors of Southern Packing, the members of the board again discussed the possible purchase of the Beverage proprietorship by Southern Packing. It was decided that the accounting firm of Haskins & Sells, which had performed accounting services for Southern Packing in the past, including an audit of its books and certification of its financial statements for the year ending December 31, 1961, should be retained to examine the books and records of the Beverage proprietorship with a view to establishing a price for it. Haskins & Sells had never acted as auditors or represented either petitioner or Maryland Beverage. The decision of the board on this matter was unanimous, except that petitioner abstained from taking part in the discussion at the meeting or casting any vote with respect to this matter. At a board of directors meeting of Southern Packing on July 2, 1962, petitioner presented a letter from Haskins & Sells, dated July 2, 1962, in which that firm made certain recommendations with respect to the possible acquisition by Southern Packing *90 of the Beverage proprietorship. The letter read, in part, as follows: Based principally on data supplied by Maryland Beverage Company, the net earnings (after income taxes) of that company have averaged $1,598.34 annually over the last eleven years and five months, and have averaged $1,732.08 annually over the last four years and five months. (The period of five months results from the change in method of conducting the business, from corporate to individual proprietorship thereby changing the fiscal year from one ending July 31 to one ending December 31.) If Southern Packing purchases Maryland Beverage there would be an increase in the net income of Southern Packing, as indicated in the preceding paragraph. If Maryland Beverage is sold to a third party and production for Maryland Beverage, now performed by Southern Packing, is done elsewhere, then Southern Packing would have its overhead expenses increased by approximately $4,500 annually, representing the share of fixed expenses (rent, depreciation of equipment, etc.) now included in billings to Maryland Beverage. Factory overhead, including both fixed and variable expenses, billed by Southern Packing to Maryland Beverage, based *91 upon production for Maryland Beverage, have averaged $11,496.65 annually over the last eleven years and five months and have averaged $7,148.52 annually over the last four years and five months. Therefore, the sale of intangible assets (trade name, formula, etc.) of Maryland Beverage to Southern Packing on the basis of ten times average annual earnings for the more recent period would seem to be reasonable, or $17,320. In addition, Southern Packing could acquire the tangible assets (inventories, receivables, etc.) at Maryland Beverage's cost, or at market if lower. * * *
Petitioner stated that the recommended price of $17,320 for the good will of the company would be acceptable to him and stated that he would be willing to sell all of the assets of the Beverage proprietorship to Southern Packing at their book value on July 2, 1962. There followed a discussion by the other members of the board of this proposal in which petitioner did not participate. The other members of the board then stated to petitioner that they felt a fair proposition for the acquisition by Southern Packing of the Maryland Beverage Company would be the following: (1) Packing would pay $17,320 for all *92 of the good will, name or any variation thereof, all formulas, trade names, trade marks, or brands. (2) Packing would pay for all of the assets owned by Maryland Beverage Company on July 2, 1962, the lower of cost or market. This figure would be reduced by all of the liabilities of Maryland Beverage Company as of that date. (3) The business would be conducted at and for the risk of Southern Packing from July 2, 1962. (4) Petitioner would warrant good title to all of the assets to be acquired, guarantee all accounts receivable to be acquired and warrant against any liabilities not deducted in arriving at the purchase price. Petitioner stated that the above proposal was entirely acceptable to him. Thereafter, it was resolved that Southern Packing acquire the business of the Beverage proprietorship on the terms listed above. Among the directors voting for this resolution was Mr. Samuel T. Brick, petitioner's brother-in-law and husband of one of the preferred stockholders. Petitioner did not vote. An agreement between petitioner and Southern Packing embodying the terms of the above proposal was executed on July 2, 1962, whereby petitioner sold to it all of the assets and good *93 will of the Beverage proprietorship, including its formulae, trade names, trade marks and brands owned or used in its business for a total sum of $23,857.17. Attached to the agreement was a balance sheet for the Beverage proprietorship as of July 2, 1962, showing assets and liabilities in the following amounts: ASSETS
Cash
$ 4,012.32
Accounts Receivable
968.26
Inventory - July 2, 1962
Finished Goods
$2,830.53
Cans and Cases
2,935.53
Supplies
1,899.36
7,665.42
TOTAL ASSETS
$12,646.00
LIABILITIES AND CAPITAL
Accounts Payable
$6,031.21
Accrued Payroll Taxes
77.62
TOTAL LIABILITIES
$ 6,108.83
W. E. LAMBLE - CAPITAL ACCOUNT
6,537.17
TOTAL LIABILITIES AND CAPITAL
$12,646.00
The agreement allocated $6,537.17 of the purchase price to the net "tangible" assets shown on the above balance sheet. The remaining $17,320 was allocated to "all of the good will of [the proprietorship] * * * including the name MARYLAND BEVERAGE COMPANY or any variation thereof, all formulae, trade names, trade marks and brands owned by or used by [the proprietorship] * * * in its business * * *". The corporation recorded the purchase on its books *94 by debiting "Formulas, Trade Names, Trade Marks, Brands, and Good Will" in the amount of $17,320, by debiting the tangible assets at book value, by crediting the liabilities at book value, and by crediting petitioner in the amount of $23,857.17. The "intangible" assets transferred by the proprietorship, not shown on the above balance sheet, included the following: (a) A contract with Dutch House, Inc. Under this contract, Maryland Beverage Company agreed to pack a chocolate drink under the Dutch House brand name of DUTCH TREETE, and Dutch House agreed to purchase all of its needs of chocolate drink from Maryland Beverage Company. The contract was terminable on 30 days' notice, but in the event of such termination by Dutch House, it was obliged to purchase at the agreed selling price all DUTCH TREETE that was packed, plus DUTCH TREETE empty cans in inventory or on order at Maryland Beverage Company's cost. Dutch House, Inc., also referred to by petitioner as the Marstan Distributing Co., is primarily a distributor to the concession industry, and the chocolate drink under its label of DUTCH TREETE is sold at football stadiums, outdoor theaters, etc., often as a hot chocolate drink. *95 The drink was distributed in many cities, such as Cleveland, Detroit and Washington, D.C., but none farther west than Chicago. Until 1961, Dutch House was the only customer of the Beverage proprietorship. (b) A contract with Sucesores Pedros Cortes, Inc., of San Juan, Puerto Rico. Under this contract, executed on January 16, 1961, the Beverage proprietorship agreed to pack a sterilized chocolate drink for Sucesores Pedro Cortes, Inc. ("Cortes") under the Cortes label of CHOCO MALTINA. The agreement was terminable on 90 days' notice, but Cortes was required to purchase all the CHOCO MALTINA on order or in inventory if it cancelled the agreement. This chocolate drink was distributed in Puerto Rico. At the time of the sale of the Beverage proprietorship to Southern Packing, Dutch House, Inc. and Cortes were the only two customers of the proprietorship. (c) A trade mark, listed on the United States Patent Office Supplemental Register, Registration No. 527,045, for the name "CHOC TREAT". Petitioner planned to market a sterilized chocolate drink in retail chain stores under Maryland Beverage's own private label, which he had a commercial artist design, and sell it under the name *96 of "CHOC TREAT". However, this trade mark had not been used prior to the date of the transfer of the proprietorship to Southern Packing. After the corporation purchased the assets of the proprietorship, it "test marketed" CHOC TREAT in Philadelphia. The product was later withdrawn from the market, and, except for a few stores in Philadelphia, is not generally available today. (d) A process for the making of a canned chocolate drink, sterilized in still retorts and not agitating cookers. This process had been used by Maryland Beverage at least since 1955. No other manufacturer produced a similar canned sterilized chocolate drink until around 1963 or 1964. The following schedule reflects the sales, net profit (loss) after taxes, and net worth of Maryland Beverage for its fiscal years ended July 31, 1951 through July 31, 1960 (cents omitted): Year
Net Profit
Ended
Sales
(Loss)
Worth *
7/31/51
$192,413
$4,752
$35,694
7/31/52
194,360
910
36,604
7/31/53
208,988
5,137
41,741
7/31/54
135,780
2,249
43,990
7/31/55
116,271
1,338
45,329
7/31/56
96,680
550
45,879
7/31/57
100,494
(4,341)
42,038
7/31/58
64,427
1,880
43,919
7/31/59
63,870
1,122
45,041
7/31/60
49,335
(44)
44,997
*97 The sales, net profit after taxes, and net worth of the Beverage proprietorship from August 1, 1960 through July 2, 1962 were as follows (cents omitted): Net
Net
Period
Sales
Profit *
Worth **
8/1/60 through 12/31/60 (five months)
$29,859
$2,672
$22,537
Year ended 12/31/61
94,424
2,019
8,450
1/1/62 through 7/2/62 (six months)
32,549
7
6,537
Petitioner did not pay himself a salary from the Beverage proprietorship, although he did make withdrawals therefrom of $26,278 in 1960 and $16,970.85 in 1961. Maryland Beverage, as a corporation, paid the following officers' salaries (to Lamble, Sr., and petitioner) and deducted these amounts on its corporate tax returns: Taxable Year
Ended July 31
Salary
1956
$7,500.00
1957
7,500.00
1958
5,000.00
1959
3,000.00
1960
3,000.00
*98 Beginning in 1954 or 1955, when petitioner's father contracted glaucoma which seriously impaired his eyesight, petitioner was required to spend most of his time attending to the operations of Southern Packing, and devoted little time to the operations of Maryland Beverage. The day-to-day management of the affairs of Maryland Beverage and the successor proprietorship required very little time or effort on the part of petitioner, and when the business was sold to Southern Packing petitioner's salary as an officer of the latter was not increased by reason of any additional duties relating to the beverage enterprise. In their 1962 joint income tax return petitioners reported $17,320 as long-term capital gain realized from the sale of "Md. Beverage Co. Formulae, Trade Brands, Trade Names & Good Will". The Commissioner, on the other hand, determined that this amount "represents a dividend from the purchasing corporation, Southern Packing Company, Inc.", taxable as ordinary income. The value of the assets thus sold was equal at least to their sales price, and petitioner did not in fact receive a dividend from the corporation in respect of such sale. Opinion RAUM, Judge: On July 2, 1962, petitioner *99 sold his sole proprietorship, trading under the name of Maryland Beverage Company, to the Southern Packing Company, Incorporated, a corporation in which he owned all the common stock. Of the total purchase price of $23,857.17, the agreement of sale allocated $6,537.17 to the net tangible assets of the proprietorship (cash, accounts receivable and inventory, less liabilities), and $17,320 to good will, "including the name Maryland Beverage Company * * * all formulae, trade names, trade marks and brands owned by or used by * * * [the proprietorship]." On his tax return for the year 1962, petitioner reported a long-term capital gain on the sale of "Md. Beverage Co. Formulae, Trade Brands, Trade Names & Good Will" of $17,320. The Commissioner determined that the intangible assets of the proprietorship had no value, and that the $17,320 allegedly paid for such intangibles in fact represented a dividend from the purchasing corporation, taxable as ordinary income and not capital gain. We hold that this transaction did not result in the receipt of a taxable dividend. We have no doubt on the evidence before us that the sale was not intended as a disguised dividend to petitioner. It was *100 precipitated by the charges of petitioner's sisters that they, as preferred stockholders, were being disadvantaged by petitioner's dual role as owner of the proprietorship, on the one hand, and his position as the sole common stockholder and principal officer of Southern Packing, on the other hand. The preferred stock dividend due July 1, 1961, had been omitted, and the following semi-annual dividend had similarly been passed. The sisters were understandably disturbed, and whether they correctly attributed any part of the situation to petitioner's ownership of the beverage enterprise, it is clear that the sale of that business to the corporation was prompted solely by an effort to resolve the conflict of interest charges. Moreover, although petitioner was dealing with his corporation in making the sale, it is also clear that independent interests protecting the sisters were involved in agreeing upon a sales price. It is inconceivable to us that they would have consented to a sale at what they thought to be an excessive price in these circumstances. Plainly, there was a bona fide sale at a price determined in good faith to be equal to fair market value. Petitioners contend that there *101 could not be any dividend in view of the bona fides of the transaction and the resulting absence of any intention to distribute a dividend, citing Palmer v. Commissioner, 302 U.S. 63. The Government, on the other hand, undertakes to distinguish Palmer, and argues in substance that a stockholder's sale to his corporation at a price in excess of fair market value, which has the effect of distributing corporate earnings, will be treated as a dividend for that reason, cf. Goldstein v. Commissioner, 298 F. 2d 562 (C.A. 9); Waldheim v. Commissioner, 244 F. 2d 1 (C.A. 7), affirming 25 T.C. 839; Timberlake v. Commissioner, 132 F. 2d 259 (C.A. 4), affirming 46 B.T.A. 1082; A. A. Emmerson, 44 T.C. 86. We need not resolve this issue, since in our view the sales price was not in fact in excess of fair market value. The trial before us was devoted largely to the issue of the fair market value of the proprietorship. This is solely a question of fact. We found defects in the details relied upon by both sides in arriving at their respective valuations, and we think it would serve no useful purpose *102 to review the evidence or to spell out the factors that impressed us as being particularly persuasive in the context of this case. We think it sufficient to state that we have considered the entire record and have found as a fact that the sales price was not in excess of fair market value. In the circumstances, the foundation for the Government's case collapses, and we conclude that there was no distribution of corporate earnings to petitioner. Decision will be entered for the petitioners. Footnotes
1. Although the parties have stipulated that petitioner's sisters were to become sole owners of the preferred stock after the recapitalization, it appears elsewhere in the record that the sisters were in fact only life beneficiaries, and that their children were the remaindermen of the trust estate.↩
*. On last day of the fiscal year.↩
*. The figures in this column reflect the computation made by Haskins & Sells which undertook to convert the proprietorship profits into after-tax corporate profits by subtracting from the proprietorship profits an assumed corporate tax based upon an assumed average rate of tax. a2 On last day of the period.↩