Elizabeth Ann RICKEY

v.

UNITED STATES of America.

Robert Harper RICKEY

v.

UNITED STATES of America.

Horace B. RICKEY, Jr., and Jewel
S. Rickey

v.

UNITED STATES of America.

Civ. A. Nos. 74–574, 74–575 and 74–632.

United States District Court,
W. D. Louisiana,
Lafayette Division.

Nov. 16, 1976.

Joseph Onebane and Lawrence L. Lewis, III, Davidson, Meaux, Onebane, Donohoe, Bernard, Torian & Diaz, Lafayette, La., for plaintiffs.

Donald E. Walter, U. S. Atty., Shreveport, La., Fred W. Schwendimann, Atty., Tax Div., Dept. of Justice, Dallas, Tex., Eugene G. Sayre, John F. Murray, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

NAUMAN S. SCOTT, Chief Judge.

We have jurisdiction under 28 U.S.C. § 1346(a)(1) of these three consolidated cases for recovery of Internal Revenue taxes.

Two basic factual situations gave rise to the issues in these three consolidated tax refund cases. The first situation occurred in 1967 and relates to issues in all three cases.

In May of 1967 Horace B. Rickey, Sr. died, naming as universal legatees his three surviving children, Horace B. Rickey, Jr., a son by a first marriage, and Elizabeth Ann Rickey and Robert Harper Rickey, children by a second marriage. Flora Womach Rickey, the surviving widow, was named executrix. Among the assets in Mr. Rickey, Sr.'s estate at the time of his death were 1,292 shares of stock in Horace B. Rickey, Inc., a Louisiana corporation engaged in the construction business. Mr. Rickey, Sr. was president of the corporation and principal shareholder, the 1,292 shares representing about 57% of the outstanding stock. Horace Rickey, Jr. owned about 31% of the outstanding stock, Elizabeth and Robert owned less than 2% each, and the balance was owned by other officers of the corporation. Horace Rickey, Jr., quite a bit older than Elizabeth and Robert, had been an officer and an active employee of the corporation, while the other two children had had no active participation in the business.

In his will Mr. Rickey, Sr. directed that his executrix should offer to the corporation the 1,292 shares, pursuant to Article VI of the Articles of Incorporation. Article VI technically required that the corporation be offered a right of first refusal at book value to the stock of a deceased shareholder, with a second right of refusal to the surviving individual shareholders. Although this Article by its terms creates only a right in the corporation to have the first chance to redeem such shares, testimony at the trial clearly established that all the shareholders considered the corporation obligated to exercise that right and to redeem these shares when offered. To this end, the corporation had purchased life insurance policies on its shareholders' lives, in order to have cash with which to redeem these shares.

Mrs. Rickey, as executrix, offered the 1,292 shares to the corporation, and at a meeting on June 5, 1967 the Board of Directors passed a resolution that the corporation would purchase them from the executrix. The corporation paid the purchase price of $383,194.28 partly in cash with proceeds from the insurance policy on Mr. Rickey, Sr., and executed a promissory note for the balance.

On June 3, 1968 Mr. Rickey, Sr.'s succession was closed and all assets distributed to the beneficiaries, including the proceeds from this redemption. For federal income tax purposes, the estate treated the redemption of the 1,292 shares as proceeds of a distribution in full payment in exchange for stock under Section 302(a) of the Internal Revenue Code of 1954 (hereinafter "The Code"), 26 U.S.C. § 302(a). Since, under the tax laws, the estate's basis in those shares would have been stepped up to their fair market value at the time of Mr. Rickey, Sr.'s death, the estate reported neither gain nor loss with respect to the transaction.

Upon audit of the estate's federal income tax return for its fiscal year ending April 30, 1968, and of the three beneficiaries' individual returns for calendar 1968, the Commissioner of Internal Revenue determined that part of the distribution in redemption constituted a dividend to the estate, taxable as ordinary income to the beneficiaries as distributees of the estate. The Commissioner treated $228,990.78 of the total proceeds of the redemption as a redemption of stock to pay death taxes under Sec-

tion 303 of the Code, and the remaining $154,202.88 as a dividend distribution under Section 301 of the Code. Thus, each beneficiary was deemed to have received one-third of this remaining amount ($51,400.96 each) as ordinary income. The Commissioner assessed deficiencies against each beneficiary based on this tax treatment; the deficiencies were paid and the beneficiaries brought these suits seeking refunds.

In June of 1973, the succession of Mr. Rickey, Sr. was re-opened in the appropriate Louisiana state court so that the executrix could file with the Commissioner a ten-year agreement under Sec. 302(c)(2)(A). The effect of this agreement has been made an issue in these cases.

The second set of facts applies only to Horace Rickey, Jr. and his suit, No. 74–632. Following the death of Mr. Rickey, Sr., Horace Rickey, Jr. became the majority shareholder of the corporation, owning, after the redemption noted above, about 72% of the stock. On October 3, 1969 the corporation and Mr. Rickey, Jr. entered into an agreement whereby the corporation would redeem 300 shares from Mr. Rickey, Jr. at a price of $700 per share, or a total of $210,000. Of this amount $15,000 was to be paid during calendar 1969, and the balance before July 31, 1970. However, the corporation actually paid $60,000 during calendar 1969, but when the balance became due on July 31, 1970, the corporation was unable to pay. The balance was paid $22,000 during calendar 1972 and $68,000 during calendar 1973. Mr. Rickey, Jr. donated 20 shares to various charities in November 1969 and in July 1970 donated another 12 shares to charities and 36 shares to other shareholders in the corporation.

On his income tax return for 1969 Mr. Rickey, Jr. reported the $60,000 he actually received during 1969 under the installment method of reporting pursuant to Sec. 453 of the Code. Moreover, he treated the amount he received, to the extent it exceeded his basis in the 300 shares, as a distribution in full payment of sale of stock, under Sec. 302(a) of the Code.

Upon audit of Mr. Rickey, Jr.'s 1969 income tax return, the Commissioner treated the 1969 redemption as essentially equivalent to a dividend under Sec. 302(b) of the Code, and taxed the proceeds as ordinary income under Sec. 301 of the Code. The Commissioner also determined that the corporation had sufficient earnings and profits to have paid the full $210,000 redemption price in calendar 1969, and thus treated the entire amount as having been constructively received during that year. Mr. Rickey, Jr. paid the deficiency assessment and claimed this amount as part of his suit for a refund.

## THE 1967 REDEMPTION

*REDEEMING SHAREHOLDER.* Sec. 302(a) of the Code provides that if a corporation redeems its stock, and if any of four tests applies to the transaction, the redemption shall be treated as a distribution in part or full payment in exchange for the stock. Sec. 302(b)(3), one of the four tests, provides that if the redemption is a complete termination of the shareholder's interest in the corporation, then the redemption shall be treated as a payment in exchange for the stock. Sec. 302(c)(1) provides that, in general, unless a specific exception applies, the ownership attribution rules of Sec. 318 should be applied in determining ownership of stock for Sec. 302 purposes. Sec. 318 provides that, *inter alia,* stock owned by a beneficiary of an estate will be considered as owned by the estate, and stock owned by an estate shall be considered as owned proportionately by the beneficiaries; there are no ownership attribution rules between siblings.

Thus, a necessary first step in applying the Sec. 302 tests is to determine whether the estate is the "redeeming shareholder" or the individual beneficiaries are the "redeeming shareholders". If the estate is the redeeming shareholder and if the Sec. 318 attribution rules apply, then the estate will be considered as owning, for Sec. 302 purposes, those shares of stock it owns directly as well as the shares owned by the beneficiaries individually. On the other hand, if the beneficiaries are the "redeeming share-

**488**

holders", each will be considered as owning, for Sec. 302 purposes, the shares of stock he owns directly plus a proportionate part of the shares owned by the estate; but, as noted above, there are no attribution rules between siblings.

█ Under the familiar principle of Louisiana Law *"le mort saisit le vif"*, the heir or, in the absence of a forced heir, the universal legatee acquires seizin and ownership of right from the moment of the decedent's death. During the administration of the estate, the administrator or executor, subject to the supervision and control of the court, has actual possession of the estate's property; the administrator or executor has seizin in fact while the heir or legatee acquires seizin of right. Louisiana Civil Code Arts. 940–948. At no time is legal ownership vested in the abstract entity known as "the succession". See *Succ. of Coco,* 185 La. 901, 171 So. 70 (1936); *Tulane Univ. v. Bd. of Assessors,* 115 La. 1025, 40 So. 445 (1906); *Johnston v. Burton,* 202 La. 152, 11 So.2d 513 (1942). The immediate passing of legal title occurs at the moment of death of the decedent, with no formal proceeding required as prerequisite. Louisiana Civil Code Art. 934. All that is required for the transfer of ownership is acceptance by the heir or legatee, which acceptance may be expressed or tacit. Louisiana Civil Code Art. 946. Thus, if this principle applied to the facts in this case, the estate would be viewed as never having "owned" the 1,292 shares, since legal title passed to the heirs at the moment of Mr. Rickey, Sr.'s death. Therefore, the beneficiaries and not the estate would have been the "redeeming shareholders" for purposes of Sec. 302 of the Code.

However, as previously noted, Sec. 302(c) evidences a general intention on the part of Congress that the attribution rules of Sec. 318 should apply in determining ownership for purposes of Sec. 302. Treas. Reg. 1.318–3 (26 C.F.R. 1.318–3) provides that, for the purpose of applying Sec. 318(a), relating to estates, property of a decedent shall be considered as owned by his estate if the property is subject to administration,

notwithstanding that, under local laws, legal title to such property vests in the decedent's heirs or legatees at the moment of decedent's death.

█ The instant case falls squarely under the circumstances envisioned by Treas. Reg. 1.318–3; Treasury Regulations must be sustained and given effect unless unreasonable and plainly inconsistent with the revenue statutes. *Commissioner of Internal Revenue v. So. Texas Lumber Co.,* 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1947). In this case Treas. Reg. 1.318–3 is neither unreasonable under the facts at hand, nor inconsistent with the revenue statutes. We thus find that, applying the general intent evidenced in Sec. 302(c), that the attribution rules should apply to that section, and Treas. Reg. 1.318–3, the estate and not the individual beneficiaries thereof must be considered the "redeeming shareholder" for purposes of Sec. 302. Thus, for purposes of applying the ownership attribution rules to Sec. 302 transactions, the Louisiana doctrine vesting legal ownership in the heirs at the moment of decedent's death is not to be considered.

█ *THE TEN–YEAR AGREEMENT.* As noted above, Sec. 302(c)(1) provides that, in general, the ownership attribution rules should apply to Sec. 302 transactions. However, Sec. 302(c)(2)(A) provides an exception to this general rule. Under that subsection, the ownership attribution rules do not apply if the distributee (the estate in the instant case), immediately after the distribution has no interest in the corporation, other than as a creditor, and files an agreement with the IRS not to acquire any such interest within 10 years of the date of the distribution or to notify the IRS of any such acquisition.

In the instant case the estate closed its fiscal year on April 30, 1968 and filed a return for that year. The return did not include an agreement as set forth in Sec. 302(c)(2)(A). The succession was re-opened in June of 1973, some five years after the close of the fiscal year in question, for the purpose of filing an appropriate 10-year agreement. Two issues are raised under

this set of circumstances: (1) Whether an estate is an appropriate entity to file such an agreement; and (2) If so, whether the agreement filed in this case was effective.

Sec. 302(c)(2)(A) specifically refers to non-applicability of Sec. 318(a)(1) if the agreement is filed. Sec. 318(a)(1) specifically sets out attribution rules between certain family members; the estate-beneficiary attribution rules are set forth in Sec. 318(a)(2)(3). Thus, a literal reading of Sec. 302(c)(2)(A) appears to limit the waiver to the family-member attribution rules. If this were correct, the estate would not be a proper entity to file a 10-year agreement, timely or otherwise.

In the case of *Estate of Crawford,* 59 T.C. 830 (1973), the Tax Court was faced with this identical issue and found that an estate is a proper entity to file the agreement. The Court noted that where a literal application of the language of a statute would lead to absurd results, that language would not be slavishly applied. See *International Trading Co.,* 57 T.C. 455 (1971). Thus, the Court reasoned, allowing only family members to file a 10-year agreement, but not allowing estates the same privilege would lead to "nonsensical result(s) in this and other cases", by preventing a family member who received his interest in a corporation through inheritance from terminating this interest in a redemption which otherwise qualifies under Sec. 302, unless the stock is first distributed to him by the estate. Further noting that even if it were always possible for estates to distribute the stock prior to redemption, such a view would place an undue premium on tax planning and set a trap for the unwary, the Court was unwilling to set such a trap by contorting the language of Sec. 302(c)(2). We agree. An estate can file an effective 10-year agreement.

■ Treas. Reg. 1.302-4(a) provides that the agreement should be attached to a return timely filed for the year in which the distribution referred to in Sec. 302(b)(3) occurs. The Rickey estate filed its agreement in 1973, some five years after the distribution. Several cases allowing the late filing of agreements, *U.S. v. Van Keppel,* 321 F.2d 717 (CA-10 1963); *Georgie S. Cary,* 41 T.C. 214 (1963); *Stanley F. Grabowski,* 58 T.C. 650 (1972); *Bernard E. Niedermeyer,* 62 T.C. 280 (1974). In the instant case, at the time of the original return in 1968 it was the position of the Commissioner that an estate could not file such a return, but that the waiver provisions were limited to the family-member attribution rules. See Rev.Rul. 59-233. It was not until the 1973 case of *Estate of Crawford, supra,* that a court had clearly held that an estate could file such an agreement. Thus, in reliance on the *Crawford* case, the estate was reopened and an agreement filed.

A mechanical application of the attribution rules is, in our view, unwise, since it would work an injustice in this case. See *Haft Trust v. C.I.R.,* CA-1, 510 F.2d 43, 48. Treas. Reg., such as 1.318-4(c) should be upheld and applied unless unreasonable and plainly inconsistent with the purpose of the statute. *Comm. v. So. Texas Lumber Co., supra.* In the instant case, particularly in view of the Commissioner's position in 1968 that an estate could not file a 10-year agreement, the strict application of Treas. Reg. 1.318-4(a) would be unreasonable and plainly inconsistent with the intent of Sec. 302(c)(2) that appropriate parties may file the required agreement and thereby obtain favorable treatment. We thus hold that the 10-year agreement filed by the estate herein, sufficient in every respect except timeliness, was nevertheless effective to waive the applicability of the estate-beneficiary attribution rules of Sec. 318(a)(2)(A), and (a)(3)(A).

■ *TERMINATION OF INTEREST.* Sec. 302(b)(3) provides that if a redemption is a complete termination of a shareholder's interest in the corporation, other than as creditor, the transaction shall be considered as payment in part or full payment in exchange for the stock, under Sec. 302(a). Since we have previously found that the 10-year agreement filed by the estate was effective to waive the attribution rules of Sec. 318, we need consider for purposes of this section only the 1,292 shares included in

**490**

the estate; none of the shares owned individually by the beneficiaries need be attributed constructively to the estate. Thus, when the estate offered and sold to the corporation the 1,292 shares, it completely terminated its interest in the corporation, other than as a creditor for part of the purchase price. Under Sec. 302(b)(3) the estate properly treated the proceeds of this redemption as a distribution in full or part payment in exchange for stock.

The plaintiffs are entitled to a refund to the extent deficiency assessments were paid because of the erroneous treatment.

### THE 1969 REDEMPTION

■ The issue in this part of the case is the appropriate tax treatment of the proceeds of the redemption of 300 shares from Mr. Rickey, Jr. in October, 1969. The Commissioner determined this amount was not a substantially disproportionate distribution under Sec. 302(b)(2) nor a complete termination of interest under Sec. 302(b)(3), but was essentially equivalent to a dividend under Sec. 302(b)(1). Mr. Rickey, Jr., contends, on the other hand, that the 300 share redemption of October 1969 was merely part of an integrated plan to reduce his stockholder interest in the corporation to a maximum of 289 shares (less than 50%) by July 31, 1970. The balance of the divestiture was to be accomplished by the transfer or donation of stock by Mr. Rickey, Jr. to various individuals and charitable organizations. Upon Mr. Rickey, Jr.'s transfer and donation of 48 shares on July 31, 1970, his interest was in fact reduced to 289 shares which comprised less than a 50% interest in the corporation.

The principal issue is whether the integrated plan in fact existed. If so, the Commissioner's tax treatment must fall.

*INTEGRATED PLAN.* Immediately prior to the redemption of October 3, 1969 Mr. Rickey, Jr. was the principal operating executive of the corporation, owned about 72% of the stock in the corporation, and was in an uncertain condition of health. In the agreement of that date with the corporation, Exhibit "E" attached to the complaint

in Civil Action No. 74–632, it was stated in part:

"WHEREAS, Horace B. Rickey, Jr. is the owner of six hundred fifty-seven shares of common stock of Horace B. Rickey, Inc. and it is his desire to dispose of sufficient stock so as to own less than fifty (50%) percent of the outstanding stock of the corporation;

WHEREAS, Horace B. Rickey, Inc. desires to purchase three hundred (300) shares of its common stock which are held by Horace B. Rickey, Jr.; and

.      .      .      .      .

WHEREAS, it is the desire to complete said sale and payment therefor within the fiscal year of the corporation which ends on July 31, 1970; and

WHEREAS, it is the desire of Horace B. Rickey, Jr. to dispose of sufficient stock in said corporation so as to leave him having a balance of two hundred eighty-nine (289) shares of stock at the end of the fiscal year of the corporation."

By letter dated July 30, 1970, joint Exhibit "11", Mr. Rickey, Jr. informed the Board of Directors of Horace B. Rickey, Inc. that he planned to transfer 48 shares of stock to 9 individuals and institutions and, by way of explanation in that letter, stated:

"I am taking this action in order that I will be able to divest myself of sufficient stock so as to reduce my ownership within the corporation to less than fifty (50%) percent. This is in keeping with my original plan as set forth during September and October of last year wherein the members of the Board of Directors and Stockholders had agreed for the corporation to acquire from me stock which I owned in the corporation."

At a special meeting of the Board of Directors of Horace B. Rickey, Inc. on July 31, 1970 and in which the Board waived its right to acquire any of the 48 shares above specified, Mr. Rickey made declarations to the Board which are referred to in the Minutes as follows:

"Mr. Rickey then set forth that his desire to dispose of the forty-eight (48) shares of stock above mentioned and as referred to

in his written offer was in order that he will be able to divest himself of sufficient stock so as to reduce his ownership within the corporation to less than fifty (50%) percent. Mr. Rickey further pointed out that this action on his part was in the furtherance of the original plan as set forth during the month of September and October of 1969, wherein the members of the Board and Stockholders had agreed for the corporation to acquire from Mr. Rickey stock which he owned in the corporation. The various members of the Board viewed the prior minutes in regard to the action and noted that this final disposition by Mr. Rickey of the forty-eight (48) shares would be in the furtherance of the plan."

These statements constitute documentary evidence that Mr. Rickey, Jr. had deliberately conceived the plan on October 3, 1969 to reduce his stock ownership in Horace B. Rickey, Inc. to 289 shares during the then current fiscal year ending July 31, 1970. One of the principal policies of the corporation was to lock in key employees of the corporation by making stock available to them and to restrict stock ownership to operating employees. This was the purpose of Article VI of the corporate charter. It was also the purpose of the stock purchase of October 3, 1969. The other stockholders were justifiably alarmed by the proportion of Mr. Rickey, Jr.'s controlling interest prior to October 3, 1969, by the condition of Mr. Rickey, Jr.'s health, and by the questionable ability of the corporation to redeem 72% of the stock in the event of Mr. Rickey, Jr.'s death. The purchase of the 300 shares was not and was never intended to be an exercise of the corporation's rights of redemption under Article VI since Mr. Rickey never contemplated a sale to any third party. It was an arms-length transaction in which Mr. Rickey, Jr. received a fair price (not book value) for his stock and the corporation and its stockholders achieved for corporate purposes a reduction of the number of shares outstanding in Mr. Rickey, Jr. Mr. Rickey, Jr., Chief Executive officer of the corporation, Mr. Etier, Secretary and an employee of the corporation for over 30 years, and Mr. Moore, Auditor for the corporation from early 1968 to date, all testified as to conversations and discussions regarding the extent of Mr. Rickey, Jr.'s controlling interest, the necessity for reducing that interest below 50% and the deliberate method or plan by which this would be accomplished. Mr. Rickey, Jr. testified that he had no personal interest or benefit in reducing his control but that he shared the view of his fellow stockholders that it was an unhealthy condition for the corporation and threatened the future stability of the corporation. This was the purpose of the plan. There is no evidence to dispute this. In fact, all of the evidence supports it. The other stockholders had devoted their lives to the success of this small corporation and made generous salaries which were jeopardized by the corporation's condition. Mr. Rickey, Jr.'s control far exceeded the two-thirds necessary to merge, dissolve, amend the articles, sell assets, etc. Mr. Rickey, Jr.'s uncertain health made the cost of insuring his life (for the purpose of redeeming his shares in the corporation) an impossible financial burden on the corporation. The mere fact that 72% control of the corporation would be outstanding and owned by non-operating persons was in itself a disturbing condition. There was no assurance that the corporation could generate the capital to redeem this interest in the event of his death. Mr. Rickey, Jr. owned more than a 50% interest in other corporations which under the then impending tax reform act (it was later passed) would force the corporation to make a joint return with other corporations and create a substantial adverse tax position for the corporation.

The Commissioner, in applying Sec. 302, considered only the effect of the reductions actually made during calendar 1969. The over-whelming evidence establishes that the initial redemption of 300 shares and the later donations were all part of an integrated plan the effect of which was ultimately to reduce the stock ownership of Mr. Rickey, Jr. below 50%. Rev.Rul. 75–447 provides that the sequence of events will be disregarded and effect given only to the overall result in determining whether a dis-

tribution was "substantially disproportionate", if the events are clearly part of an overall integrated plan to reduce the shareholder's interest. In this case Mr. Rickey, Jr. devised a plan whereby he would divest himself of sufficient stock to bring his ownership below 50% at the termination of the corporation's fiscal year ending July 31, 1970. The redemption agreement of October 3, 1969 and the subsequent donations were accomplished in accordance with that plan. Since the redemption of October 1969 was merely one phase of the plan, we must consider the overall effect of the plan and disregard, for the purposes of applying Sec. 302, the sequence of events. See Rev.Rul. 75–447.

■ *SUBSTANTIALLY DISPROPORTIONATE DISTRIBUTION.* Sec. 302(b)(2) provides that if the distribution is substantially disproportionate as to the shareholder, it shall be considered as payment in exchange for stock under Sec. 302(a). The statute further provides certain tests which must be applied in determining the applicability of this subsection: (1) immediately after the redemption the shareholder must own less than 50% of the total combined voting power of the corporation; (2) immediately after the redemption the shareholder must own less than 80% of the voting stock which he owned immediately before the redemption; and (3) immediately after the redemption the shareholder must own less than 80% of the total common stock which he owned immediately before the redemption, Sec. 302(b)(2)(B), (C)(i), (C)(ii).

In the instant case Mr. Rickey, Jr. owned about 72% of the outstanding stock of the corporation immediately before the redemption and about 49% after the completion of the overall plan. Thus, by applying the mechanical rules of Sec. 302(b)(2) we see that after the completion of the plan, he owned less than 50% of the total combined voting stock, and he owned less than 80% of the stock he had owned prior to the October 1969 redemption (there is only one class of stock). The effect of the overall plan was a substantially disproportionate distribution as to Mr. Rickey, Jr.

■ There is another basis upon which plaintiff should be entitled to treat these proceeds as a distribution in exchange for the stock. Under Sec. 302(b)(1), this treatment is to be accorded a transaction which is "not essentially equivalent to a dividend".

In *U. S. v. Davis,* 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970), the Supreme Court held that the relevant inquiry under this section is whether the redemption in question results in a meaningful reduction of the shareholder's proportionate interest in the corporation. If such is the result, the redemption may fairly be characterized as a sale. Where the distribution merely transfers property to a shareholder without any change in his relative economic interests or rights, the redemption has the character of a dividend and must be treated as "essentially equivalent to a dividend".

In *Wright v. U. S.,* 482 F.2d 600 (CA-8 1973), the shareholder had reduced his ownership interest from 85% to 61.7%. Since under Arkansas state law, two-third vote was required for amending the articles of incorporation, for merger or consolidation, and for liquidation, the court found this reduction significantly altered the relative positions of the shareholders and thus qualified under Sec. 302(b)(1). The court read *Davis, supra,* as holding that the proper inquiry was the percentage change in ownership in the corporation and the attendant overall results due to that change.

In the instant case, the redemption of 300 shares in October 1969 reduced Mr. Rickey, Jr.'s ownership from 72% to 58%. Under the Louisiana Business Corporation Law, a two-third vote is required for amending the Articles of Incorporation (L.R.S. 12:31), for merger of consolidation (L.R.S. 12:112), for the voluntary sale, lease, exchange or disposition of all or substantially all of the assets of the corporation (L.R.S. 12:121) and for liquidation and dissolution (L.R.S. 12:142). Thus, under the principles set out in *Davis* and *Wright, supra,* the redemption resulted in a meaningful reduction of Mr. Rickey's ownership interest and significantly altered his economic interests and rights relative to

the other shareholders. The transaction was not essentially equivalent to a dividend within the meaning of Sec. 302(b)(1).

█ Article VI of the Articles of Incorporation provides that if a shareholder desires to sell his stock during his lifetime, he must first offer it to the corporation, then to individual shareholders at book value. In October 1969 the book value of stock in Horace B. Rickey, Inc. was $500 per share. The price at which the stock was redeemed pursuant to the October 3, 1969 agreement was $700 per share. The contention has been made that Mr. Rickey, Jr. received a constructive dividend to the extent the purchase price exceeded the book value, $200 per share.

The evidence establishes, as we have stated previously, that the redemption was part of the overall plan to reduce Mr. Rickey, Jr.'s interest below 50%. There is not a shred of evidence that he intended a sale to any third party or that the redemption of October 1969 was an exercise of the corporation's rights under Article VI. It was not. The corporation's right to redeem stock is not limited to the provisions of Article VI. A corporation may redeem stock when and at a price that serves adequately a corporate purpose. Because this corporation was a small, closely held corporation, and because Mr. Rickey, Jr. was the majority shareholder at the time, we must make a close examination of the transaction to determine if this was, indeed, a fair and reasonable sale or a disguised distribution which should be treated as a dividend. Article VI has no relevance to this determination.

The testimony made clear that all the shareholders were concerned about Mr. Rickey's majority interest. The basis of this concern has been disclosed above. The redemption in October 1969 was part of a plan to reduce Mr. Rickey's ownership and remedy these valid concerns. Thus, there were valid business reasons behind the transaction. See *Lambell*, 26 T.C.M. 912 (1967).

Even though Mr. Rickey, Jr. was dealing with a corporation of which he was majority shareholder, it is clear that these valid business purposes existed, and do not preclude a conclusion that the transaction was a fair one made at arms length. See *Staab*, 20 T.C. 834 (1953); *MacMurray*, 21 T.C. 15 (1953); *Lambell, supra*.

In this case, if Mr. Rickey were dealing from a purely selfish motive, there would have been no reason for disposing of his shares at that time. He could have held his shares until his death, and then his executor would be required to offer them back to the corporation. Whether the corporation had sufficient cash from insurance, or had to seek funds elsewhere, would have been a matter for the corporation's concern, not Mr. Rickey's or his executor. However, Mr. Rickey was willing to sell to it certain of his shares, but only at a fair market price. Since the corporation was receiving a benefit by not having to purchase additional insurance, the directors were willing to forego their right to purchase at book value and offer a fairer price which exceeded book value. We do not feel that Article VI prohibits such a transaction. Each side received some benefit and each gave up some interest in a compromise beneficial to both.

Mr. Moore, an independent Certified Public Accountant, and Mr. Etier, an Accountant, both minority shareholders, testified that the fair market value was in excess of $800 per share, reduced because of possible unliquidated tax obligations of the corporation, to a sum slightly in excess of $700 per share. The corporation and Mr. Rickey, Jr. negotiated and settled on a price of $700 per share, a transaction beneficial to the corporation.

We find therefore that there existed a valid business purpose for the corporation to waive its option to purchase at book value and offer a price reflective of fair market value. The actual price agreed upon was a fair and reasonable price, and the excess of purchase price over book value did not represent a constructive dividend.

A form of judgment in favor of plaintiffs and consistent with these findings and conclusions should be submitted for execution.